**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
NORTHERN DIVISION

| | |
|---|---|
| BOARD OF TRUSTEES OF THE M.M. & P. HEALTH & BENEFIT PLAN, BOARD OF TRUSTEES OF THE M.M. & P. MARITIME ADVANCEMENT, TRAINING, EDUCATION AND SAFETY PROGRAM, AND BOARD OF TRUSTEES OF THE M.M. & P. INDIVIDUAL RETIREMENT ACCOUNT PLAN<br><br>      Plaintiffs,<br><br>v.<br><br>GRAND RIVER NAVIGATION COMPANY, INC.<br><br>      Defendant. | Case No. 1:20-cv-677 |

**COMPLAINT**

Plaintiffs, Board of Trustees of the M.M.& P. Health and Benefit Plan ("Health Plan"), Board of Trustees of the M.M.& P. Maritime Advancement, Training, Education and Safety Program ("MATES Plan"), and Board of Trustees of the M.M.& P. Individual Retirement Account Plan ("IRAP") (collectively, the "M.M.& P. Plans" or "Plans"), by their counsel, hereby complain of Defendant Grand River Navigation Company, Inc. ("GRN") as follows:

**Introduction**

1.  This action is brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 et seq. (1982), and the Labor Management Relations Act of 1948 ("LMRA"), 29 U.S.C. § 185.  Plaintiffs seek a money judgment awarding delinquent

contributions, interest, liquidated damages, and attorneys' fees and costs as a result of Defendant's failure to pay contributions required under its collective bargaining agreements ("CBAs").

## Jurisdiction and Venue

2.      Jurisdiction of this Court arises pursuant to 28 U.S.C. §§ 1331 and 1337 (federal questions and commerce) , Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), and Section 301 of the LMRA, 29 U.S.C. § 185.

3.      Authority for obtaining personal jurisdiction over a defendant outside the State of Maryland is provided by Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2).

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because the Plans are administered in this District.

## Parties

5.      Each of the M. M. & P. Plans is a multiemployer employee benefit plan within the meaning of Section 3(3) and 3(37) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(37).  Each of the Plans is principally administered at 700 Maritime Boulevard, Suite A, Linthicum Heights, MD, 21090-1996.

6.      Plaintiffs, the Boards of Trustees of each of the Plans, are fiduciaries of each of the Plans within the meaning of Section 3(21) of ERISA, 29 § U.S.C. 1002(21).  The Trustees bring this action on behalf of the Plans, and their participants and beneficiaries, pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, and Section 301 of the LMRA, 29 U.S.C. § 185.

7.      Upon information and belief, Defendant GRN is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1026 Hannah Ave., Suite D, Traverse City, Michigan 49684. GRN is an employer within the meaning of 29 U.S.C. § 152(2) and

Section 3(5) of ERISA, 29 U.S.C. § 1002(5), and is engaged in an industry affecting commerce within the meanings of Sections 3(11) and (12) of ERISA, 29 U.S.C. §§ 1002(11) and (12).

**Factual Allegations**

**A.      Background**

8.      Upon information and belief, GRN is a provider of bulk freight shipping services that has operated on the Great Lakes since 2000.

9.      Upon information and belief, GRN employs over a hundred sailing employees who sailors are members the International Organization of Masters, Mates, and Pilots ("Union").

10.      At all times pertinent to this action, GRN and the Union have been parties to CBAs obligating GRN to make monthly contributions to the Plans for all of its employees doing work covered by the CBAs.

**B.      The Plans' Trust Agreements and Delinquency Policy**

***The Health Plan***

11.      GRN has been a contributing employer to the Health Plan since September 1, 2000 and executed the Plan's Agreement and Declaration of Trust ("Health Trust Agreement") on October 15, 2000.

12.      The CBAs in effect at all relevant times expressly make GRN a party to the Health Plan and thus bind it to the terms and provisions of the Health Plan's Agreement and Declaration of Trust, including amendments thereto.

13.      The Health Trust Agreement requires that employer "[c]ontributions shall be made in accordance with procedures to be determined by the Trustees."

14.     The Health Trust Agreement establishes that the Trustees of the Health Plan have the "exclusive authority to control and manage the operation and administration of the Plan."

15.     The Health Trust Agreement further provides that the Trustees "shall, in their discretion, formulate and adopt a welfare program for participants and their beneficiaries, and establish Rules and Regulations for eligibility, coverage and benefits, and for administration and operation thereof, and all other matters which the Trustees, in their discretion, deem necessary or proper to the effectuation of the purposes of the Plan."

16.     Additionally, the Health Trust Agreement provides that that Trustees "shall have full authority to determine all questions of coverage and eligibility for benefits, to construe and interpret the provisions of this [Trust Agreement] and of the Rules and Regulations adopted for the Health & Benefit Program and the terms used in said [Trust Agreement] and such Rules and Regulations; and any construction and interpretation so determined shall be binding upon all persons or parties concerned, subject only to judicial review."

17.     The Health Trust Agreement also provides that the Trustees "shall have the power to demand, collect, sue for, receive and hold the Employer contributions [to] or any other claim of the Plan, and they are authorized to take any and all steps as may be necessary or appropriate to effectuate the collections from Employers of contributions and other sums due to the Plan, to require advance payments or other security for contributions, to charge to and recover from Employers any legal fees which may be incurred, and to assess interest charges for delinquent payments." And it provides that the "Trustees shall also have the power to require each Employer to furnish appropriate information to establish that such Employer is making full payment to the Trustees of the required contributions."

***The MATES Plan***

18.     At all relevant times GRN has been a contributing employer to the MATES Plan.

19.     The CBAs in effect at all relevant times expressly make GRN a party to the MATES Plan and thus bind it to the terms and provisions of the MATES Plan's Agreement and Declaration of Trust including amendments thereto ("MATES Trust Agreement").

20.     The MATES Trust Agreement provides that employer "[c]ontributions shall be made in accordance with procedures to be determined by the Trustees."

21.     The MATES Trust Agreement establishes that the MATES Plan Trustees have the "exclusive authority to control and manage the operation and administration of the Program [i.e. the MATES Plan]."

22.     The MATES Trust Agreement also provides that the Trustees "shall have the power to demand, collect, sue for, receive and hold the Employer contributions or any other claim of the Program and they are authorized to take any and all steps as may be necessary or appropriate to effectuate the collections from Employers of contributions and other sums due to the Program; to require advance payments or other security for contributions, to charge to and recover from Employers any legal fees which may be incurred, and to assess interest charges for delinquent payments." And it provides that the "Trustees shall also have the power to require each Employer to furnish appropriate information to establish that such Employer is making full payment to the Trustees of the required contributions."

### *The IRAP*

23.      At all relevant times GRN has been a contributing employer to the IRAP.

24.      Additionally, the CBAs in effect at all relevant times expressly make GRN a party to the IRAP and thus bind it to the terms and provisions of the IRAP's Agreement and Declaration of Trust including amendments thereto ("IRAP Trust Agreement").

25.      The IRAP Trust Agreement provides that employer "[c]ontributions shall be made in accordance with procedures to be determined by the Trustees."

26.      The IRAP Trust Agreement establishes that the Trustees of the IRAP have the "exclusive authority to control and manage the operation and administration of the Program [i.e.] Plan."

27.      The IRAP Trust Agreement further provides that the Trustees "shall have the power to demand, collect, sue for, receive and hold the Employer contributions or any other claim of the Plan, and they are authorized to take any and all steps as may be necessary or appropriate to effectuate the collections from Employers of contributions and other sums due to the Plan, to require advance payments or other security for contributions, to charge to and recover from Employers any legal fees which may be incurred, and to assess interest charges for delinquent payments."  And it provides that the "Trustees shall also have the power to require each Employer to furnish appropriate information to establish that such Employer is making full payment to the Trustees of the required contributions."

### *The Plans' Delinquency Policy*

28.      Pursuant to their authority under the respective Plans' Trust Agreements, the Plans' Trustees enacted and adopted the joint M.M.& P. Plan Policy for Delinquent Contributions, Payroll

Audits and Mistaken Contributions ("Delinquency Policy"), which applies to each of the Plans and their contributing employers.

29.    The CBAs and the Plans' respective Trust Agreements bind GRN to all rules adopted by the Plans' Boards of Trustees, including the Delinquency Policy.

30.    Per the Delinquency Policy, GRN's contributions to the Plans are due on the 10th business day of the month following the month for which contributions are owed.  The Delinquency policy establishes that interest will be assessed on delinquent contributions (at the annual interest rate of prime plus 4%), and provides that if the delinquencies are referred to the Plans' counsel for collection, the Plans' Trustees may authorize counsel to file suit against the contributing employer under ERISA Sections 515 and 502(g)(2) to recover the delinquent contributions, together with interest, liquidated damages and the costs of collection, including attorney's fees.

31.    GRN self-reports the contributions it makes each month, which requires the Plans to rely on the honesty and accuracy of the information that GRN provides in support of such contributions. To confirm whether GRN is making the contributions as required by the CBAs, the Plans must review detailed information and documents in addition to the informal reports that GRN provides with its monthly contributions.  The Delinquency Policy establishes specific policies and procedures for the Plans to conduct such review of each contributing employers' books and payroll records ("Audit Procedures").

**C.    The Plans' Audit of GRN for the 2011-2016 Period**

32.    By letter dated June 20, 2017, the Plans notified GRN that it was initiating review of GRN's contributions to the Plans for the period January 1, 2011 through December 31, 2016 to be conducted by the Plans' outside accounting firm ("Auditor").  In that letter, the Plans informed GRN

that a representative of the Auditor would be contacting GRN to "advise you of what documents they will need to review and to schedule the examination."

33.     The Plans' Auditor requested documents from GRN and corresponded back and forth with GRN and its counsel for several months to obtain the relevant documents needed to determine whether GRN had made the proper amount of contributions to the Plans as required by the CBAs. GRN proved uncooperative, providing only a limited amount of the information requested.

34.     The process of obtaining the necessary information was further delayed while GRN went through a Chapter 11 bankruptcy reorganization, which was filed on January 29, 2018 and concluded with the reorganization becoming effective on March 1, 2018.

35.     Following GRN's emergence from bankruptcy, GRN continued its pattern of non-cooperation and ultimately, on March 6, 2018, the Plans' counsel made a written demand for GRN to produce the necessary records. By letter of March 15, 2018, GRN said it would make the remaining records available for review at two locations in Michigan: Payroll Administrator Sue Kelley's home office in Rogers City, and GRN's office in Traverse City.

36.     In early May 2018, representatives from the Auditor's office traveled from Maryland to Michigan to review the records that GRN made available, spending several days reviewing multiple boxes of documents.

37.     Around the same time, in early May 2018, in recognition that the Plans still did not have the documents and information needed to complete the audit, the Plans and GRN entered into an agreement that tolled, as of December 12, 2017, any claims by the Plans against GRN for delinquent contributions ("Tolling Agreement"). By agreement of the parties, this Tolling Agreement did not expire until March 13, 2019.

8

38.     Following the Auditors' visit to GRN's offices in Michigan, the Auditor requested from GRN additional explanation needed to understand and verify the data and information in the documents reviewed.

39.     After eventually receiving information and documents sufficient to complete the review, in accordance with the Plans' Audit Procedures, the Auditor presented its initial audit findings to GRN and provided GRN with 60 days to respond to those findings before finalizing the audits and issuing final audit reports to the Plans.  For the MATES Plan, the Auditor issued its final audit report to the Plan Office on December 26, 2019.  For IRAP, the Auditor issued its final audit report to the Plan Office on January 20, 2020.  For the Health Plan, the Auditor issued its final report to the Plan Office on February 20, 2020.

**D.     MATES Plan Audit Delinquencies for 2011-2016**

40.     As stated in its audit report for the MATES Plan, the Auditor found that GRN had underpaid its contributions to the MATES Plan by $62,937.50 during the period of January 1, 2011 through December 31, 2016 and had incurred interest on those delinquencies in the amount of $26,298.32 through December 31, 2019.

41.     In accordance with the Audit Procedures, on February 3, 2020  the MATES Plan sent GRN a letter transmitting the Auditors' report and demanding payment of the $62,937.50 in audit delinquencies owed to the MATES Plan plus interest of $26,298.32, as well as the $11,500 cost of the audit.

42.     In a letter dated February 13, 2020, GRN refused to pay the audit delinquencies and related damages owed to the MATES Plan.

### E.      IRAP Audit Delinquencies for 2011-2016

43.      As stated in its audit report for the IRAP, the Auditor found that GRN had underpaid its contributions to the IRAP by $187,927.71 for numerous employees during the period of January 1, 2011 through December 31, 2016 and had incurred interest on those delinquencies in the amount of $87,827.08 through December 31, 2019.

44.      In accordance with the Audit Procedures, the IRAP sent a letter to GRN on February 3, 2020 transmitting the Auditor's report and demanding payment of the $187,927.71 in audit delinquencies owed the IRAP, plus interest of $87,827.08, as well as the $20,000 cost of the audit.

45.      In a letter dated February 13, 2020, GRN refused to pay the audit delinquencies and related damages owed to the IRAP.

### F.      Health Plan Delinquencies

#### *Underpayments for January and March Since March 2017*

46.      With respect to its obligation to contribute to the Health Plan, the relevant language in GRN's CBAs covering both licensed and non-licensed personnel has been the same or similar in all material respects in the applicable CBAs.  This language provides:

> The Company shall contribute ninety percent (90%) of the premium cost of the Health Plan for its Employees covered by this Agreement, which contribution shall constitute the sole obligation of the Company to such Plan…All Employees shall be eligible for coverage after thirty (30) days of employment with the Company, and once eligible, coverage shall continue through the last day of the third (3rd) month following the month in which said Employee last worked with the Company. ***It is understood that the obligation of the Company is to make monthly contributions for all billets aboard the vessel, and that the Company need not make more monthly contributions than the number of billets, unless by doing so, an Employee would lose eligibility under the Plan as a result.*** Employees who establish eligibility during a given season and who are employed on a full time rotation basis shall be provided continuous coverage during the subsequent offseason. [Emphasis added].1

---

1 This is from the CBA covering licensed personnel.  The CBA covering unlicensed personnel that has an effective date of April 1, 2017 through March 31, 2022, requires GRN to contribute a

10

47.     On March 24, 2017, GRN sent a letter to the Union demanding a credit in the amount

of $962,420 for alleged overpayments that GRN made to the Health Plan for the months of January

and March from 2006 through 2017 ("Claimed Overpayments").  GRN asserted that it had overpaid

contributions to the Health Plan because for the months of January and March it made a premium

contribution for every sailor who was employed by the company.  GRN maintains that under the

CBAs it was only required to contribute premiums based on the number of billets on vessels.

According to GRN, this resulted in the Claimed Overpayments in the amount of $962,420. The

Union denied GRN's demand for a credit and, on April 10, 2017, GRN initiated a grievance

arbitration with the Union over the disputed Claimed Overpayments.

48.     During the one-day evidentiary hearing held on October 22, 2018 by Arbitrator

Joseph Girolamo, GRN's longtime Payroll Administrator, Sue Kelley, provided uncontroverted

testimony that explained the basis for the contributions that GRN made to the Health Plan since the

early 2000s.  She explained that when GRN first started contributing to the Plan in 2000, it did not

make premium contributions for any employees for January, February or March, but within the first

or second year of when GRN first started contributing to the Plan, GRN received multiple calls from

employees complaining that their healthcare coverage had lapsed.  She explained that to avoid

situations where employees lost eligibility for coverage during the non-sailing season, GRN started

making a premium contribution for every one of its employees for January and March of each year

to avoid any lapses in coverage for its employees.  She further explained that GRN continued with

this practice up until the contributions owed for March 2017, when it unilaterally decided to

---

slightly different percentage of the premium, requiring 90% as of April 2017 and April 2018,
85% as of April 2019, and 80% as of April 2020 and April 2021.

contribute premiums for March and January based only on the number of billets on vessels that sailed.

49.     On February 13, 2019 Arbitrator Girolamo issued his opinion and award denying GRN's grievance and found that, with respect to the premiums that GRN contributed for every one of its employees for January and March in order to avoid a lapse in coverage, the company did not decide to make those contributions because it was "provided with erroneous contribution information or…prevented from obtaining any information as it relates to premium contributions on behalf of its employees" and added that GRN did not question this contribution practice until it began to experience financial issues in 2016 and 2017.  He also found that because GRN was a party to the Health Plan's Trust Agreement, GRN was bound to the Health Plan's policies and procedures and was thus required to follow the Health Plan's procedures for seeking a credit for a claimed overpayment.  Arbitrator Girolamo also ruled that it was for the Health Plan's Trustees, and not for him, to decide whether GRN was entitled to receive a credit or refund for the Claimed Overpayment.

50.     Under the doctrine of collateral estoppel and well-established law, GRN is bound by the Arbitrator's award and decision with respect as it relates to any defenses or claims it has against the Health Plan.

51.     Following Arbitrator Girolamo's decision, the Health Plan's Trustees completed a review of the facts, documents and evidence to decide whether GRN is eligible for a credit or refund for any of the Claimed Overpayments.

52.     Based on their review, the Health Plan's Trustees determined that GRN is not eligible for a credit or refund for any of the Claimed Overpayments and issued its written decision to GRN by letter from their counsel dated March 13, 2020.

53.     The Health Plan's Trustees determined that, based on the facts and evidence, GRN did not make the Claimed Overpayments due to a mistake of fact or law.  The contribution language of the CBAs requires GRN "to make monthly [premium] contributions for all billets aboard the vessel, and that the Company need not make more monthly contributions than the number of billets, ***unless by doing so, an [employee] would lose eligibility under the Plan as a result***." (Emphasis added).  The CBAs do not, however, specify what amount of premium contributions are necessary to prevent an employee from losing eligibility under the Plan and therefore, in this regard, the CBAs are ambiguous.  The longstanding practice of the bargaining parties has been to interpret this CBA language to require GRN to make a premium contribution for every one of its employees for January and March to avoid employees from losing eligibility for coverage under the Plan during the non-sailing season.  This practice continued for over fifteen years and, under applicable law, should be relied on in interpreting the ambiguous term of the CBAs regarding the contributions required to avoid a lapse in coverage for GRN's employees. Indeed, Ms. Kelley's uncontroverted testimony at the arbitration hearing demonstrates that making payments in January and March for every employee is exactly what the bargaining parties intended and that, absent such payments, the employees would lose coverage.  Thus, GRN's claim that it made overpayments ignores the language of the CBAs that requires an amount of contributions beyond the number of billets to prevent employees from losing eligibility from coverage, and ignores 15years or more of the parties' longstanding practice of interpreting this ambiguous provision of the CBAs to require premium contributions for everyone for January and March.

54.     At all times, the language in the CBAs regarding GRN's obligation to contribute has stayed the same, and the bargaining parties have never agreed to different language that would change GRN's obligation to contribute in the manner it had been contributing prior to March 2017.

13

Thus, at all relevant times, GRN had and continues to have an obligation under the applicable CBAs to make a premium contribution for every one of its employees for January and March.

55.     Beginning with the contributions due for March 2017 GRN unilaterally ceased making a premium contribution for every one of its employees as required, and instead contributed based only on the number of billets on vessels that sailed that month.  GRN has done the same for every January and March since that time through the present.  By failing to make a premium contribution for every one of its employees for January and March, GRN has thus breached its obligation to contribute to the Health Plan and incurred contribution delinquencies owed to the Health Plan.

56.     Based on information in GRN's remittance reports for the months of January and March since March 2017 showing the number of sailors employed by GRN as of those months, the number of premium contributions made for those months, and the applicable monthly premium rate for those months, it is estimated that GRN owes the Health Plan  at least $438,923 in delinquent contributions as a result of breaching its obligation to contribute a premium for every one of its employees for January and March ("January and March Underpayments") with interest of $59,952.74 that has accrued on the January and March Underpayments through March 13, 2020 plus the additional interest that will accrue through the time the delinquent amounts are paid.  The reason that this amount can only be estimated at this time is that based on the information that GRN has provided the Health Plan, it is not clear exactly how many sailors were employed by GRN for certain of the months at issue.

57.     By letter dated February 12, 2020, the Health Plan demanded that GRN pay the January and March Underpayments owed plus the accrued interest within 10 days to avoid the filing

of a lawsuit.  In a letter dated February 20, 2020, GRN refused to pay the January and March Underpayments and related damages owed to the Health Plan.

### *Health Plan Audit Delinquencies for 2011-2016*

58.     In accordance with the Audit Procedures, the Auditor applied the Trustees' interpretation of GRN's obligation to contribute to the Health Plan, i.e. that at all times it has been required to make a premium contribution for every one of its employees for January and March, and finalized its audit report accordingly.

59.     As stated in its audit report for the Health Plan, the Auditor found that GRN had underpaid its contributions to the Health Plan by $11,965 during the period of January 1, 2011 through December 31, 2016 and had incurred interest on those delinquencies in the amount of $5,490.75 through February 2020.

60.     In accordance with the Audit Procedures, on February 25, 2020 the Health Plan sent GRN a letter transmitting the Auditors' report and demanding payment of $11,965 in audit delinquencies owed the Health Plan, plus interest of $5490.75, as well as the $16,460 cost of the audit.

61.     In a letter dated March 5, 2020, GRN refused to pay the audit delinquencies and related damages owed to the Health Plan.

**E.        The Plans' Audit of GRN for January 1, 2011 through December 31, 2017**

62.     Given that the Auditors' final audit reports showed that GRN had not contributed the proper amounts to the Plans as required under the applicable CBAs for the 2011-2016 audit period, the Plans initiated an audit of GRN's payroll records and books for the period of January 1, 2017 through the present time ("New Audit").  Specifically, by letter from the Plans' Administrator dated February 14, 2020, the Plans notified GRN that the Plan's Auditor would be reviewing GRN's

records "to verify that the contributions are being made in accordance with the [CBAs]" covering the New Audit period, and that a representative of the Auditor would be contacting GRN to "advise you of what documents they will need to review and to schedule the examination."

63.     Based upon GRN's failure to make the proper amount of contributions during the 2011-2016 audit period, it is anticipated that the New Audit will similarly show that GRN failed to make the proper amount of contributions during the period of January 1, 2017 forward.

## COUNT I
### MATES Plan's Claim for Delinquent Contributions for the 2011-2016 Audit

64.     Plaintiffs incorporate the foregoing Paragraphs as if stated herein.

65.     The CBAs in effect at all relevant times obligate GRN to submit monthly contributions and remittance reports to the MATES Plan.

66.     As found by the MATES Plan's Auditor, GRN has failed to pay $62,937.50 in contributions owed to the MATES Plan for the period of January 1, 2011 through December 31, 2016.

67.     By failing to pay the required contributions for the 2011-2016 audit period, GRN has violated Section 515 of ERISA, 29 U.S.C. § 1145, Section 302 of the LMRA, 29 U.S.C. § 186, and the Trust Agreement.

68.     Pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), the LMRA, the Trust Agreement, the CBAs, and the Delinquency Policy, GRN is liable to the MATES Plan for $62,937.50 in delinquent contributions for the 2011-2016 audit, at least $26,298.32 in interest on the delinquent contributions that has accrued through December 31, 2019 and the additional interest that will continue to accrue at the rate of prime plus 4% until the delinquent amounts are paid, the

$11,500 cost of the audit, $12,587.50, in liquidated damages, and reasonable attorneys' fees and costs incurred by the Plan in pursuing collection of the delinquent amounts.

**COUNT II**
**IRAP's Claim for Delinquent Contributions for the 2011-2016 Audit**

69.     Plaintiffs incorporate the foregoing Paragraphs as if stated herein.

70.     The CBAs in effect at all relevant times obligate GRN to submit monthly contributions and remittance reports to the IRAP.

71.     As found by the IRAP's Auditor, GRN has failed to pay $187,927.71 in contributions owed to the IRAP for the period of January 1, 2011 through December 31, 2016.

72.     By failing to pay the required contributions for the 2011-2016 audit period, GRN has violated Section 515 of ERISA, 29 U.S.C. § 1145, Section 302 of the LMRA, 29 U.S.C. § 186, and the Trust Agreement.

73.     Pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), the LMRA, the Trust Agreement, the CBAs, and the Delinquency Policy, GRN is liable to the IRAP for $187,927.71 in delinquent contributions for the 2011-2016 audit, at least $87,827.08 in interest on the delinquent contributions that has accrued through December 31, 2019 and the additional interest that will continue to accrue at the rate of prime plus 4% until the delinquent amounts are paid, the $20,000 cost of the audit, a minimum of $87,827.08 in liquidated damages and reasonable attorneys' fees and costs incurred by the Plan in pursuing collection of the delinquent amounts.

**COUNT III**
**Health Plan's Claims for Delinquent Contributions for the 2011-2016 Audit & the**
**January and March Underpayments since March 2017**

74.     Plaintiffs incorporate the foregoing Paragraphs as if stated herein.

75.     The CBAs in effect at all relevant times obligate GRN to submit monthly contributions and remittance reports to the Health Plan.

76.     As found by the Health Plan's Auditor, GRN has failed to pay $11,965 in contributions owed to the Health Plan for the period of January 1, 2011 through December 31, 2016.

77.     To date, GRN has also failed to pay certain contributions owed for March 2017, January and March 2018, January and March 2019, and January 2020 (i.e. the January and March Underpayments), which are currently only able to be estimated and are in the range of $327,000 to $417,000 based on the information that GRN has provided to the Plan.

78.     By failing to pay the required contributions, GRN has violated Section 515 of ERISA, 29 U.S.C. § 1145, Section 302 of the LMRA, 29 U.S.C. § 186, and the Trust Agreement.

79.     Pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), the LMRA, the Trust Agreement, the CBAs, and the Delinquency Policy, GRN is liable to the Health Plan for:

        a)     $11,965 in delinquent contributions for the 2011-2016 audit, at least $5,490.75 in interest on those delinquent contributions that has accrued through February 29, 2020 and the additional interest that will continue to accrue at the rate of prime plus 4% until the delinquent amounts are paid, the $16,460 cost of the audit, $2,393 in liquidated damages, and reasonable attorneys' fees and costs incurred by the Plan in pursuing collection of those delinquent amounts.

        b)     At least $438,923 in estimated delinquent contributions for the January and March Underpayments, $59,952.74 in interest on those delinquent contributions that has

accrued through March 13, 2020 and the additional interest that will continue to accrue at the rate of prime plus 4% until the delinquent amounts are paid, $$87,784.60 in liquidated damages, and reasonable attorneys' fees and costs incurred by the Plan in pursuing collection of those delinquent amounts.

## COUNT IV
### Plans' Claims for Delinquent Contributions for the New Audit

80.     Plaintiffs incorporate the foregoing Paragraphs as if stated herein.

81.     Upon information and belief, GRN has failed to make the proper contributions to the Plans for the New Audit period.  This is based on the audit findings for the 2011-2016 audit period showing that GRN has a pattern and practice of not making the proper contributions.

82.     By failing to pay these required contributions, GRN has violated Section 515 of ERISA, 29 U.S.C. § 1145, Section 302 of the LMRA, 29 U.S.C. § 186, and the Plans' Trust Agreements.

83.     Pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), the LMRA, the Trust Agreement, the CBAs, and the Delinquency Policy, GRN is liable to the Plans for the delinquent contributions uncovered by the audits for the New Audit period, the interest accruing on those contributions at the rate of prime plus 4% until the delinquent amounts are paid, the cost of the audits, liquidated damages of the greater of the interest on the delinquent contributions or 20 percent of the delinquent contributions,  and reasonable attorneys' fees and costs incurred by the Plans in pursuing collection of the delinquent amounts.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

A.     Order GRN to pay to the MATES Plan:

19

(1)     $62,937.50 in delinquent contributions;

(2)     $26,298.32 in interest, plus interest accruing until the contributions are paid, as required by Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2);

(3)     $12,587.50 in liquidated damages, which is the greater of the interest on the delinquent contributions or 20 percent of the delinquent contributions, as required by ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2);

(4)     the cost of the 2011-2016 audit in the amount of $11,500;

(5)     attorneys' fees and other costs of collection as required by ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2); and

(6)     contributions that become delinquent or are discovered delinquent during the pendency of this action and the related damages and penalties as provided under ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2) and the Delinquency Policy.

B.     Order GRN to pay to the IRAP:

(1)     $187,927.71 in delinquent contributions;

(2)     $87,827.08 in interest, plus interest accruing until the contributions are paid, as required by Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2);

(3)     $87,827.08 in liquidated damages, which is the greater of the interest on the delinquent contributions or 20 percent of the delinquent contributions, as required by ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2);

(4)     the cost of the 2011-2016 audit in the amount of $20,000;

(5)     attorneys' fees and other costs of collection as required by ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2); and

(6)     contributions that become delinquent or are discovered delinquent during the
        pendency of this action and the related damages and penalties as provided
        under ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2) and the Delinquency
        Policy.

C.      Order GRN to pay to the Health Plan:

(1)     $11,965 in delinquent contributions for the 2011-2016 Audit;

(2)     $5,490.75 in interest, plus interest accruing until those contributions are paid,
        as required by Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2);

(3)     $2,393 in liquidated damages, which is the greater of the interest on the
        delinquent contributions or 20 percent of the delinquent contributions, as
        required by ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2);

(4)     the cost of the 2011-2016 audit in the amount of $16,460;

(5)     At least $438,923 in delinquent contributions for the January and March
        Underpayments;

(6)     $59,952.74 in interest for the January and March Underpayments, plus
        interest accruing until those contributions are paid, as required by Section
        502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2);

(7)     $87,784.60 in liquidated damages, which is the greater of the interest on the
        delinquent contributions or 20 percent of the delinquent contributions, as
        required by ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2);

(8)     attorneys' fees and other costs of collection as required by ERISA Section
        502(g)(2), 29 U.S.C. § 1132(g)(2); and

(9)     contributions that become delinquent or are discovered delinquent during the

pendency of this action, including but not limited to those uncovered in the

New Audit, and the related damages and penalties as provided under ERISA

Section 502(g)(2), 29 U.S.C. § 1132(g)(2) and the Delinquency Policy.

B.      Restrain and enjoin GRN, its officers, agents, servants, attorneys, successors,

assigns, and all persons acting on its behalf or in conjunction with it from failing or refusing

to pay to the Plaintiffs all amounts, including contributions, interest, liquidated damages, and

attorneys' fees and costs which it is obligated to pay under the terms of the CBAs, to include

an injunction requiring GRN to continue to pay premium contributions to the Health Plan for

every one of its employees for the months of January and March in accordance with its

obligation under the CBAs as established by its past practices, unless the contribution

obligation language in the CBAs is explicitly changed to alter or amend that obligation.

C.      Retain jurisdiction of this case pending compliance with its Orders, and

D.      Grant such other and further relief as the Court may deem just.

Dated: March 13, 2020                        Respectfully submitted,

                                            */s/ Alexander M. Gormley*
                                            Barry S. Slevin (Bar No. 06173)
                                            Allison A. Madan (Bar. No. 09274)
                                            Alexander M. Gormley (Bar No. 18265)
                                            SLEVIN & HART, P.C.
                                            1625 Massachusetts Avenue, NW, Suite 450
                                            Washington, D.C.  20036
                                            bslevin@slevinhart.com
                                            amadan@slevinhart.com
                                            agormley@slevinhart.com
                                          (202) 797-8700 (tel)
                                          (202) 234-8231 (fax)

                                            *Counsel for Plaintiffs*

      A copy of this Complaint will be served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, as required by Section 502(h) of ERISA, 29 U.S.C. § 1132(h).

20815710v1