IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BOARD OF TRUSTEES OF THE &ast;
M.M. &amp;P. HEALTH &amp; BENEFIT
PLAN, et al., &ast;

    Plaintiffs, &ast;

v. &ast;       Civil Action No. GLR-20-677

GRAND RIVER NAVIGATION &ast;
COMPANY, INC.,
&ast;

    Defendant.

&ast;&ast;&ast;

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiffs/Counterclaim Defendants Board of Trustees of the M.M. &amp;P. Health &amp; Benefit Plan (the "Health Plan"), Board of Trustees of the M.M.&amp;P. Maritime Advancement, Training, Education and Safety Program ("MATES"), and Board of Trustees of the M.M.&amp;P. Individual Retirement Account Plan's ("IRAP") (collectively, the "MM&amp;P Plans" or "Plans") Motion to Dismiss or, Alternatively, for Summary Judgment on Grand River Navigation Company, Inc.'s ("Grand River") Amended Counterclaims (ECF No. 23).[1] The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the

---

[1] Also pending before the Court is the Plans' Motion to Dismiss or, Alternatively, for Summary Judgment on Grand River's Counterclaims, and to Strike Jury Demand, which was filed on August 21, 2020. (ECF No. 17). Grand River subsequently filed its Amended Answer and Counterclaims on September 11, 2020. (ECF No. 20). The filing of an amended pleading typically moots any pending motions to dismiss that pleading. See Venable v. Pritzker, No. GLR-13-1867, 2014 WL 2452705, at *5 (D.Md. May 30, 2014), aff'd, 610 F.App'x 341 (4th Cir. 2015). Accordingly, the Court will deny this Motion as moot.

reasons outlined below, the Court will grant the Motion, which it construes as a motion to dismiss.

## I.     BACKGROUND

### A.     MM&P Plans' Complaint

Defendant Grand River Navigation Company, Inc., is a provider of bulk freight shipping services. (Compl. ¶ 8, ECF No. 1). Grand River employs more than one hundred sailing employees who are members of the International Organization of Masters, Mates, and Pilots (the "Union"). (Id. ¶ 9). At all times relevant to this action, Grand River and the Union have been parties to collective bargaining agreements ("CBAs"), which obligate Grand River to make monthly contributions to the Health Plan, MATES, and IRAP for all of Grand River's employees doing work covered by the CBAs. (Id. ¶ 10).[2]

At all times relevant to this action, Grand River has been a contributing employer to the Health Plan, MATES, and IRAP. (Id. ¶¶ 11, 18, 23). Grand River has also been a party to trust agreements with each of the Plans (the "Trust Agreements"). (Id. ¶¶ 12, 19, 24). The Trust Agreements require that employer "[c]ontributions shall be made in accordance with procedures to be determined by the Trustees" and establishes that trustees of each Plan have the "exclusive authority to control and manage the operation and administration of the [Plan]." (Id. ¶¶ 13–14, 20–21, 25–26). The Trust Agreements also provide that the trustees for each Plan "shall have the power to demand, collect, sue for,

---

[2] The Health Plan, MATES, and IRAP are each a multiemployer employee benefit plan within the meaning of Sections 3(3) and 3(37) of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1002(3), (37). (Compl. ¶ 5; Def.'s Answer to Compl., Defenses & Am. Countercls. ["Am. Countercls."] ¶¶ 4–6, ECF No. 20).

receive and hold the Employer contributions or any other claim of the [Plan], and they are authorized to take any and all steps as may be necessary or appropriate to effectuate the collections from Employers." (Id. ¶¶ 17, 22, 27).

Pursuant to their authority under the Trust Agreements, the trustees of the Plans enacted and adopted the joint M.M.&P. Plan Policy for Delinquent Contributions, Payroll Audits and Mistaken Contributions ("Delinquency Policy"), which applies to each of the Plans and their contributing employers. (Id. ¶ 28). The Delinquency Policy permits the Plans' trustees to file suit against a contributing employer under Sections 515 and 502(g)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., to recover unpaid contributions, together with interest, liquidated damages, and attorney's fees. (Id. ¶ 30).

Under the Delinquency Policy, Grand River's contributions to the Plans are due on the tenth business day of the month following the month for which contributions are owed. (Id.). Grand River self-reports its monthly contributions, meaning that the Plans typically must rely on the accuracy of the information Grand River provides in support of such contributions. (Id. ¶ 31). Additionally, the Delinquency Policy permits the Plans to audit a contributing employer's books and payroll records to confirm whether the employer is making contributions as required by the CBAs. (Id.).

By letter dated June 20, 2017, the Plans notified Grand River they were initiating an audit of Grand River's contributions to the Plans for the period of January 1, 2011 through December 31, 2016. (Id. ¶ 32). The audit was delayed for several reasons, including that (a) Grand River initially provided incomplete information to the Plans'

auditor, (b) Grand River underwent Chapter 11 bankruptcy reorganization in January 2018, and (c) the auditor had to travel to Michigan to review the records that Grand River made available. (Id. ¶¶ 33–36). In May 2018, recognizing that the Plans did not have the documents and information needed to complete the audit, the Plans and Grand River entered into an agreement that tolled, as of December 12, 2017, any claims by the Plans against Grand River for delinquent contributions (the "Tolling Agreement"). (Id. ¶ 37). By agreement of the parties, the Tolling Agreement did not expire until March 13, 2019. (Id.).

The auditor issued its final audit reports for MATES, IRAP, and the Health Plan on December 26, 2019, January 20, 2020, and February 20, 2020, respectively. (Id. ¶ 39). The auditor found that Grand River underpaid its contributions to MATES by $62,937.50 during the period of January 1, 2011 through December 31, 2016, and incurred interest on those delinquencies in the amount of $26,298.32 through December 31, 2019. (Id. ¶ 40). The auditor also found that Grand River underpaid its contributions to IRAP by $187,927.71 for the period of January 1, 2011 through December 31, 2016, and incurred interest on those delinquencies in the amount of $87,827.08 through December 31, 2019. (Id. ¶ 43). As for the Health Plan, the auditor found that Grand River underpaid its contributions by $11,965 during the period of January 1, 2011 through December 31, 2016, and incurred interest on those delinquencies in the amount of $5,490.75 through February 2020. (Id. ¶ 59). The Health Plan also concluded that Grand River underpaid certain additional contributions by at least $438,923 since March 2017, and incurred interest on those delinquencies in the amount of $59,952.74 through March 13, 2020. (Id. ¶ 56).

In accordance with the Delinquency Policy, MATES and IRAP each sent Grand River a letter on February 3, 2020 demanding payment of the delinquent contributions, interest, and fees for the audits. (Id. ¶¶ 41, 44). Likewise, the Health Plan sent Grand River a demand letter on February 25, 2020. (Id. ¶ 60). Grand River refused to pay the Plans the delinquent contributions and other costs. (Id. ¶¶ 42, 45, 61). In light of Grand River's failure to make adequate contributions for years 2011 through 2016, the Plans initiated a new audit of Grand River on February 14, 2020, for the period of January 1, 2017 through the present. (Id. ¶¶ 62, 63).

## B.      Grand River's Counterclaims

The CBAs between Grand River and the Union cover Grand River's "licensed" and "unlicensed" employees. (Def.'s Answer to Compl., Defenses & Am. Countercls. ["Am. Countercls."] ¶¶ 21–23, ECF No. 20). Each licensed and unlicensed position on a vessel is referred to as a "billet." (Id. ¶¶ 24–25). During the sailing season, which runs from April 1 to December 31 each year, sailors rotate in and out of the billets on a ship. (Id. ¶¶ 26–27). Thus, more than one sailor fills each billet. (Id.). There are no billets on board during the offseason, which generally runs from January 1 to March 31, or when a vessel is in a dry dock. (Id.). The CBAs provide:

> It is understood that the obligation of the Company is to make monthly contributions for all billets aboard the vessel, and that the Company need not make more monthly contributions than the number of billets, unless by doing so, [an employee] would lose eligibility under the Plan as a result. Employees who establish eligibility during a given season and are employed on a full-time rotation basis shall be provided continuous coverage during the subsequent offseason.

(Id. ¶ 30). The CBAs expressly require that "[i]n the event the Company makes contributions into [the Plan] in excess of the required rate, such excess contributions shall be credited to the Company." (Id. ¶ 31).

From at least 2001 through January 2017, Grand River paid Health Plan contributions based on billets during the sailing season. (Id. ¶ 43). For each offseason during that period, however, Grand River paid a contribution to the Health Plan for every eligible sailor employed by Grand River, rather than contributions based on the number of billets on Grand River's vessels. (Id.). Grand River states that it "paid a contribution for every eligible employed sailor in January and March of each year because Grand River was misled to believe such contributions were necessary to maintain all employees' eligibility for health care coverage through the offseason." (Id. ¶ 44).

Grand River and the Union began renegotiating the CBAs in February 2016. (Id. ¶¶ 37–38). During a negotiation session on February 21, 2017, Ken Ryan, the Health Plan's longtime Director of Benefits, "admitted that it was not necessary for Grand River to pay a contribution for every employee in January and March and that if Grand River paid solely based on billets for those months, no employee would have lost eligibility." (Id. ¶¶ 47–48). Thus, "it became clear that Grand River had been overpaying on its healthcare contributions under the CBAs." (Id. ¶ 50). Ryan also informed Grand River that it was not entitled to a credit under the CBA for the years of overpayments and admitted "the Health Plan improperly used Grand River's overpayments to artificially keep premiums low for other employers participating in the Health Plan." (Id. ¶¶ 54–55).

On March 7, 2017, Grand River filed a grievance against the Union demanding that it comply with the terms of the CBA and provide a credit to Grand River for the overpaid healthcare contributions. (Id. ¶ 56). Grand River also sent the Union a letter demanding a credit for the overpayments on March 24, 2017. (Id. ¶ 57). On March 27, 2017, the Union responded by letter explaining "that to the extent Grand River was entitled to a credit or refund, Grand River's recourse was against the [Health] Plan." (Id. ¶ 58). The Union's letter also stated that "[t]he [Health] Plan is an ERISA plan administered by a Board of Trustees over which the Union has no control" and that the "Union has no authority to speak on behalf of the Plans." (Id. ¶ 60). Grand River states that, upon information and belief, the Union forwarded copies of Grand River's correspondence to the Plans' administrator and legal counsel. (Id. ¶ 59). As such, the Union and the Health Plan were aware in March 2017 that the CBAs did not require Grand River to make healthcare contributions for every employee in January and March to maintain eligibility for those employees under the Health Plan. (Id. ¶ 61).

For its March 2017 contributions to the Health Plan, rather than making contributions for each of its 137 employees, Grand River paid only seventy-five employee healthcare contributions, consistent with the number of billets from the prior sailing season. (Id. ¶¶ 62–63). Likewise, for January and March 2018 and January 2019, Grand River paid seventy-four contributions to the Health Plan, equal to the number of billets from the previous sailing seasons. (Id. ¶ 65). At that time, Grand River had approximately 150 sailing employees, none of whom lost coverage under the Health Plan. (Id. ¶¶ 66, 68). The

Union did not object to Grand River's new approach to healthcare contributions. (See id. ¶¶ 69–74).

Grand River subsequently initiated arbitration proceedings against the Union to determine whether the Union was liable to Grand River for its overpayments to the Health Plan.[3] (Id. ¶¶ 75–76). On May 17, 2017, the Health Plan sent a letter to the arbitrator claiming, among other things, that the Health Plan "is not a party to the arbitration [and] it will not be bound by any decision that the [arbitrator] may render." (Id. ¶ 78). The arbitration took place in October 2018. (Id. ¶ 79). By a written award issued in February 2019, the arbitrator found "that if Grand River was entitled to a credit or refund for overpayments, it should proceed to the Health Plan with its request." (Id. ¶ 80). The arbitrator did not decide whether Grand River is entitled to a credit for any overpaid contributions to the Health Plan. (Id. ¶ 85).

On or about April 1, 2019, the Health Plan informed Grand River that it was going to immediately cancel healthcare coverage for more than fifty unidentified Grand River employees unless Grand River identified who had sailed in March and paid the exact number of healthcare contributions demanded by the Plan. (Id. ¶ 94). The Health Plan's demand for immediate payment contradicted the Plan's longstanding rule that healthcare payments and documentation for a given month did not need to be submitted until the tenth day of the following month. (Id. ¶ 95). The Health Plan also refused to explain why it would cancel the coverage. (Id. ¶¶ 97–98). To avoid loss of coverage, however, Grand River made

---

[3] This arbitration did not involve IRAP and MATES. (Id. ¶ 83).

twenty-three additional healthcare contributions to the Plan. (Id. ¶ 99). Grand River also provided the Health Plan with reports showing the number of billets for that month, the employees who worked on each vessel, the number of contributions made, and information regarding new or departing employees and employees on leave for that period. (Id. ¶ 104). The Health Plan accepted these reports without objection. (Id. ¶ 105).

On March 4, 2020, several Grand River employees advised the company that they had received notices from the Health Plan indicating that their healthcare coverage had been canceled, effective at midnight on February 29, 2020. (Id. ¶ 107). Around that time, the Union sent a newsletter to Grand River's employees "falsely accus[ing] Grand River of unilaterally changing the way it paid healthcare contributions." (Id. ¶ 112). Grand River immediately contacted the Health Plan to determine why its employees lost healthcare coverage and request a detailed accounting of how the Health Plan had allocated Grand River's contributions since April 1, 2019. (Id. ¶¶ 117, 120). The Health Plan refused to explain why certain employees lost eligibility, identify the names of employees who received the notices, or provide an accounting of Grand River's contributions. (Id. ¶¶ 118–19, 121). Nevertheless, in order to reinstate healthcare coverage for the employees who received termination notices, Grand River made twelve additional contributions to the Health Plan. (Id. ¶¶ 122–23).

In the months thereafter, Grand River requested to meet with the Health Plan to discuss Grand River's pending claim for a credit of past overpayments. (Id. ¶ 125). In response to this request, the Health Plan informed Grand River that representatives from the Union would engage Grand River regarding its healthcare contributions. (Id. ¶¶ 128–

9

29). Grand River met with the Union on October 14, 2019. (Id. ¶ 132). Rather than addressing Grand River's request for a credit, the Union focused solely on its demand that Grand River resume making contributions for every employee in January and March. (Id. ¶ 133). The Union also threatened to increase the contribution rate for Grand River's employees in violation of the CBAs. (Id. ¶¶ 136–37). After the meeting, the Union sent Grand River a letter reiterating its demand for Grand River to pay more for employee coverage. (Id. ¶ 138). The letter stated that "the Plan's actuary was not aware that [Grand River] was making contributions for a period that was less than twelve months each year, nor was the actuary aware that [Grand River] makes contributions based on billets instead of covered employees." (Id. ¶ 140). Thus, according to Grand River, the Union's letter revealed that "it was the Health Plan's and/or its actuary's negligence that had created and/or contributed to the claimed Health Plan financial difficulties that [the Union] now tried to blame on Grand River." (Id. ¶ 139).

Grand River attempted to meet with the Health Plan to discuss this matter on January 22, 2020, but the meeting was canceled. (Id. ¶¶ 146, 149). Shortly thereafter, the Plans served Grand River with demands for alleged underpayments to the Plans. (Id. ¶¶ 152, 154). By letter dated February 27, 2020, Grand River disputed liability for the alleged underpayments to the Plans. (Id. ¶ 153). On March 13, 2020, the Health Plan sent Grand River a letter denying the company's request for a credit of overpayments. (Id. ¶ 154). The same day, Grand River also demanded from the Health Plan an additional credit in the amount of $342,480 plus interest for overpayments from January 2017 to the date of the letter. (Id. ¶ 157). The Health Plan did not respond to Grand River's request. (Id. ¶ 158).

### C.    Procedural History

The MM&P Plans filed their Complaint on March 13, 2020. (ECF No. 1). The four-count Complaint alleges that Grand River failed to make adequate contributions to the each of the Plans for the period of January 1, 2011 through December 31, 2016, and failed to make certain additional contributions to the Health Plan for March 2017, January and March 2018, January and March 2019, and January 2020, in violation of Section 515 of ERISA, 29 U.S.C. § 1145; Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186; and the Trust Agreements (Counts I–III). (Compl. ¶¶ 64–79). The Complaint also alleges that the new audit will show that Grand River failed to make adequate contributions for the period of January 1, 2017 to the present (Count IV). (Id. ¶¶ 80–83).

Grand River filed its Answer and Counterclaims on May 11, 2020. (ECF No. 7). On August 21, 2020, the MM&P Plans moved to dismiss Grand River's counterclaims. (ECF No. 17). Grand River filed its Amended Counterclaims on September 11, 2020. (ECF No. 20). The Amended Counterclaims seek restitution for overpayment of contributions to the Health Plan from 2006 to present in the amount of $2,300,232 (First Amended Counterclaim), as well as return of overpaid contributions to MATES and IRAP for unspecified amounts (Second and Third Amended Counterclaims). (Am. Countercls. ¶¶ 260–315).

The Plans moved to dismiss Grand River's Amended Counterclaims on October 8, 2020. (ECF No. 23). Grand River filed its Opposition on November 13, 2020. (ECF No. 27). On December 11, 2020, the Plans filed a Reply. (ECF No. 30).

## II.   STANDARD OF REVIEW

### A.   Conversion

The Plans' Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

Generally, "a court may not consider extrinsic evidence at the 12(b)(6) stage." Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC, 794 F.Supp.2d 602, 611 (D.Md. 2011). Under limited circumstances, however, a court may consider documents beyond the pleadings without converting the motion to dismiss to one for summary judgment. Goldfarb v. Mayor & City Council of Balt., 791 F.3d 500, 508 (4th Cir. 2015). For instance, the Court may consider a document attached to a counter-defendant's motion to dismiss if it is "integral to and explicitly relied on" in the counterclaims and the

"[counter-plaintiffs] do not challenge its authenticity." See Chesapeake Bay Found., 794 F.Supp.2d at 602 (quoting Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc., 367 F.3d 212, 234 (4th Cir. 2004)). In addition to integral and authentic exhibits, the Court "may properly take judicial notice of matters of public record." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

Here, the Plans have included several extra-pleading documents for the Court's consideration. (See ECF Nos. 23-2–23-20). Of particular significance is the Health Plan's March 13, 2020 letter denying Grand River's request for a credit of purported overpayments made between 2006 and 2017 (the "Denial Letter"). (See Denial Letter, ECF No. 23-10). Grand River refers to the Denial Letter in its Amended Counterclaims, (see Am. Countercls. ¶ 154), and this Denial Letter forms the basis of its claim against the Health Plan. Moreover, Grand River does not dispute the authenticity of the Denial Letter. For this reason, the Court will consider the Denial Letter without converting the Plans' Motion to one for summary judgment.

**B.** **Motion to Dismiss**

When reviewing a motion to dismiss a counterclaim brought pursuant to Federal Rule of Civil Procedure 12(b)(6), "[t]his Court applies the same standard of review that would be applied to a Rule 12(b)(6) motion to dismiss a complaint." First Data Merch. Servs. Corp. v. SecurityMetrics, Inc., No. RDB-12-2568, 2013 WL 6234598, at *3 (D.Md. Nov. 13, 2013) (citing Shoregood Water Co. v. U.S. Bottling Co., No. RDB-08-2470, 2010 WL 1923992, at *1–2 (D.Md. May 11, 2010)). Accordingly, the counterclaim must allege enough facts to state a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). Legal conclusions or conclusory statements do not suffice and are not entitled to the assumption of truth. Id. (citing Twombly, 550 U.S. at 555).

The Court "must determine whether it is plausible that the factual allegations in the [counterclaim] are 'enough to raise a right to relief above the speculative level.'" Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir.2009) (quoting Andrew v. Clark, 561 F.3d 261, 266 (4th Cir. 2009)). And in doing so, the Court must examine the counterclaim as a whole, consider the factual allegations in the counterclaim as true, and construe the factual allegations in the light most favorable to the counter-plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, see United Black Firefighters v. Hirst, 604 F.2d 844, 846–47 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

### III.   DISCUSSION

#### A.   **Legal Standard**

Grand River's counterclaims against the Plans arguably implicate Section 403(c)(1) of ERISA. ERISA is "a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983). These plans affect the "well-being and security of millions of

employees and their dependents," 29 U.S.C. § 1001(a), and are of paramount importance to "the national economy, and . . . the financial security of the Nation's work force," Boggs v. Boggs, 520 U.S. 833, 839 (1997). "Because these plans often have immense assets, the dangers of abuse in plan administration are apparent." Chao v. Malkani, 452 F.3d 290, 293 (4th Cir. 2006) (citation omitted). ERISA was thus designed to deter "the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds." Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., 519 U.S. 316, 326–27 (1997) (internal quotation marks and citation omitted).

ERISA Section 403(c)(1), also known as the "anti-inurement provision," provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). The Supreme Court has emphasized that Section 403(c)(1) was crafted "to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others." Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 23 (2004) (citation omitted). Consistent with this principle, the United States Court of Appeals for the Fourth Circuit has held that ERISA's anti-inurement provision "exists to protect plan assets and ensure that they benefit the participating employees for whom, after all, the plans were established." U.S. Foodservice, Inc. v. Truck Drivers & Helpers Local Union No. 355 Health & Welfare Fund, 700 F.3d 743, 747 (4th Cir. 2012)

15

As an exception to the anti-inurement provision, however, Section 403(c)(2)(A)(ii) provides that if a contribution or payment "is made by an employer to a multiemployer plan by a mistake of fact or law," Section 403(c)(1) "shall not prohibit the return of such contribution or payment to the employer within 6 months after the plan administrator determines that the contribution was made by such a mistake." 29 U.S.C. § 1103(c)(2)(A)(ii). "By its terms, the statute neither prohibits nor requires return of a mistaken contribution, leaving the decision in the first instance to the sound discretion of the plan administrator." U.S. Foodservice, 700 F.3d at 747–48. Indeed, the Fourth Circuit has explained that "section 403(c) is clear that it is the plan administrator—not a reviewing court—that determines in the first instance (1) whether a given contribution was made by mistake and (2) if so, whether it should be returned to the contributing employer." Id. at 749. In other words, an employer cannot pursue claims for overpayment against a multiemployer benefit plan in court until it requests a refund and the plan administrator denies that request. See Trs. of Int'l Union of Operating Engineers Loc. 132 Health & Welfare Fund v. Brown's Excavating, Inc., No. 5:14CV118, 2015 WL 2354624, at *3 (N.D.W.Va. May 15, 2015) (holding that employers failed to state a claim for return of overpayments because they "have not alleged in their complaint that they have fulfilled the initial requirements of [ERISA] § 403 as set out in United States Foodservice").

## C.    **Analysis**

The MM&P Plans contend that Grand River's counterclaims against MATES and IRAP should be dismissed because Grand River did not first submit its overpayment claims to the plan administrator as required by ERISA Section 403(c)(2)(A)(ii). The Plans also

contend that Grand River's counterclaim against the Health Plan should be dismissed in part for the same reason. The Court addresses these claims in turn.[4]

### 1.     MATES and IRAP

At the outset, the Court must first determine whether ERISA Section 403(c)(2)(A)(ii) applies to Grand River's counterclaims against MATES and IRAP. Grand River styles its counterclaims as claims for "Federal Common Law Equitable Restitution" and states that it "brings [its] counterclaims pursuant to [ERISA § 403] and federal common law." (Am. Countercls. at 71, 73; id. ¶ 9). Grand River thus asserts that, because its counterclaims arise under common law, the requirements of Section 403(c)(2)(A)(ii) do not apply.

Grand River's approach misses the mark. As the Plans correctly point out, although the Fourth Circuit has not expressly decided whether employers have a federal common law right to recover overpayments from multiemployer plans, the Fourth Circuit has made clear that the framework of section 403(C)(2)(A)(ii) applies equally regardless of whether the claims are styled as common law claims or claims arising under ERISA. See U.S. Foodservice, 700 F.3d at 747 (noting that ERISA "provides a clear framework for [the court's] analysis" of both the employer's unjust enrichment claim and section 403 claim). The Fourth Circuit's approach is consistent with that of other circuit courts, which have held that an employer's common law right to bring a claim for overpayments flows from

---

[4] The Plans also argue that Grand River's counterclaims should be dismissed because they are untimely under the Delinquency Policy and barred by the relevant statutes of limitations. Because the Court will dismiss Grand River's counterclaims for failure to comply with ERISA Section 403(c)(2)(A)(ii), the Court need not address this argument.

the rights created by Section 403(c)(2)(A)(ii). See, e.g., Frank L. Ciminelli Const. Co. v. Buffalo Laborers Supplemental Unemployment Ben. Fund, 976 F.2d 834, 835 (2d Cir. 1992).

Having found that Grand River's counterclaims against MATES and IRAP are governed by ERISA's anti-inurement provision, the Court next considers whether Grand River satisfied the procedural requirements of Section 403(c)(2)(A)(ii) prior to countersuing. As discussed above, it is the plan administrator, not a court, that determines in the first instance if a contribution was made by mistake and whether the contribution should be returned. See U.S. Foodservice, 700 F.3d at 749. As such, an employer's failure to submit a refund request to the plan's administrator prior to filing suit is grounds for dismissal. See Brown's Excavating, Inc., 2015 WL 2354624, at *3 (holding that employers failed to state a claim because they failed to allege they had "provided the [plan administrator] with the opportunity to consider whether the contributions the [employers] made to it were made by mistake of fact or law").

Grand River admits that it did not request a refund of any purported overpayments from MATES or IRAP before filing its counterclaims. (Am. Countercls. ¶¶ 296, 309). As the Plans correctly note, these admissions alone are grounds for dismissal of Grand River's counterclaims against these Plans. Nonetheless, Grand River contends that its failure to formally request a refund of its purported overpayments to MATES and IRAP should be excused because: (1) determining if Grand River made any overpayments is contingent on evaluating the accuracy of the Plans' audits; and (2) submitting a refund request would

have been futile because any request would have been denied as untimely under the Plans' Delinquency Policy.

These arguments fail as a matter of law. First, because "employers have readily available and accurate information concerning factors such as the number of hours each employee worked in each pay period," Frank L. Ciminelli Constr. Co., 976 F.2d at 836, the burden of calculating contributions falls on the employer, not the multiemployer benefit plan or its auditors. See Crown Cork & Seal Co. v. Teamsters Pension Fund, 549 F.Supp. 307, 312 (E.D.Pa. 1982) ("ERISA surely did not intend to impose the risk of mistaken contributions on the funds, particularly since the employer is in the best position to monitor the amount of its own contributions."). The information Grand River needs to determine the amount of any overpayments to MATES and IRAP should be within its control; therefore, the Court sees no reason why Grand River must wait for a judicial determination on the Plans' audits before requesting a refund from MATES and IRAP.

Second, Grand River does not cite, and the Court is not aware of, any cases in which a court excused an employer's failure to comply with the requirements of Section 403(c)(2)(A)(ii) on grounds of futility. To the contrary, courts are clear that the procedural requirements of Section 403(c)(2)(A)(ii) are "not an administrative exhaustion requirement" that can be waived for futility; rather, "the statute itself prohibits refunds unless they are made within 6 months of the plan administrator's determination that a mistake was made," which cannot take place "until the employer makes a request for a refund based on a mistake." Trs. of Operating Eng'rs Health & Welfare Tr. Fund for N. Cal. v. Precision Crane Servs. Inc., No. C07-05323 CRB, 2008 WL 1817297, at *3

(N.D.Cal. Apr. 22, 2008). Here, Grand River cannot escape the fact that it was required to submit refund requests to MATES and IRAP so that the Plans could determine whether payments were made in mistake and, if so, whether Grand River was entitled to a refund of such payments. The possibility that the Plans would have denied Grand River's requests is no excuse.

In sum, because Grand River failed to comply with the threshold requirement of Section 403(c)(2)(A)(ii), its counterclaims against MATES and IRAP must be dismissed.

### 2.    Health Plan

Once again, the Court must first determine whether ERISA Section 403(c)(2)(A)(ii) applies to Grand River's counterclaims against the Health Plan. Grand River argues that Section 403 does not apply because it is not seeking a refund or return of monies deposited in the Plan, but rather a credit against future healthcare contributions due under the CBA. In other words, Grand River contends that its counterclaim does not violate ERISA's anti-inurement provision because a credit is "different [from a refund] in that there is no transfer of money from the plan to the employer." (Def./Countercl. Pl.'s Mem. Law Opp'n Countercl. Defs.' Mot. Dismiss Alt. Summ. J. Am. Countercls. ["Opp'n"] at 16, ECF No. 27).

This argument fails. ERISA's anti-inurement provision not only prohibits the transfer of plan assets to an employer, but also forbids the use of plan assets in any way that would benefit a contributing employer, including giving an employer a credit for past overpayments. See Chao, 452 F.3d at 298 (explaining that the employer's "requested offset [of excess contributions against delinquent contributions] would violate ERISA's anti-

inurement provision, because Plan assets would benefit [the employer]"); see also Operating Engineers Loc. 324 Health Care Plan v. Dalessandro Contracting Grp., LLC, No. 10-11256, 2012 WL 831758, at *5 (E.D.Mich. Mar. 12, 2012) ("Courts have consistently held that the statutory language 'shall not prohibit the return' means that a credit or refund to an employer is permissible but not required.") (quoting Whitworth Bros. Storage Co. v. Cent. States, Se. & Sw. Areas Pension Fund, 982 F.2d 1006, 1019 (6th Cir. 1993)).

Moreover, Grand River's assertion that its counterclaims are governed by the express terms of the CBA and not Section 403(c)(2)(A)(ii) is unavailing. Grand River points to a provision in the CBAs which provides that "[i]n the event [Grand River] makes contributions into [the Plans] in excess of the required rate, such excess contributions shall be credited to [Grand River]." (Am. Countercls. ¶ 31). It is well-settled, however, "that parties cannot contract around the requirements of ERISA." Borroughs Corp. v. Blue Cross Blue Shield of Mich., No. 11-12557, 2012 WL 3887438, at *4 (E.D.Mich. Sept. 7, 2012) (citation omitted); see also Gastronomical Workers Union Local 610 v. Dorado Beach Hotel Corp., 617 F.3d 54, 62 (1st Cir. 2010) (explaining that ERISA's "statutory mandates operate in tandem with contractually imposed duties" and are "independent of whatever arrangements private agreements may contemplate") (citations omitted). Thus, the language in the CBAs does not subvert the applicability of Section 403(c)(1) to Grand River's counterclaims, nor does it excuse Grand River's duty under Section 403(c)(2)(A)(ii) to first submit any claims for overpayment to the plan's administrator for

review. For these reasons, the Court will evaluate Grand River's counterclaims under the analysis set forth in ERISA Section 403(c)(2)(A)(ii).

Grand River asserts that it is entitled to a total credit of $2,300,232 in overpayments it made to the Plan. Prior to filing its counterclaims, Grand River submitted, and the Health Plan denied, a refund request to the Health Plan for $962,420 in overpayments. Grand River later submitted a refund request for an additional $342,480 in claimed overpayments to the Health Plan; however, at the time Grand River filed its counterclaims, the Health Plan had not issued a decision on the merits of this request. As for the remaining $995,332 in alleged overpayments that make up the balance of Grand River's request, it appears that Grand River never specifically requested return of these funds from the Health Plan. The Plans thus assert that Grand River only satisfied the requirements of Section 403(c)(2)(A)(ii)—that is, the request was submitted by Grand River and denied by the Plan's Trustees—for its request for $962,420. Therefore, the Plans contend Grand River's counterclaim against the Health Plan should be dismissed to the extent it seeks a credit in excess of that amount.

In response, Grand River argues that it has adequately pleaded its demand for the full amount set forth in its counterclaim against the Health Plan. Grand River notes that, although its formal demand letter requested only $962,420 from the Health Plan, the Plan was "well aware" that the claim the total claim for overpayments equaled $1,957,752 because Grand River proved an additional $995,332 in overpayments "through testimony and exhibits" during the arbitration proceedings. (Opp'n at 21). Additionally, as to its March 13, 2020 request for an additional $342,480 in overpayments, Grand River argues

that the Health Plan "chose not to respond to the March 13, 2020 demand letter until September 2020" and this delay "should not prejudice Grand River." (Opp'n at 21–22).

The Court is not persuaded. Grand River admits that its initial refund request to the Health Plan requested only $962,420 in claimed overpayments. (See Am. Countercls. at 20). Additionally, the Trustees' March 13, 2020 decision denying the request was expressly limited to that amount. (See Denial Letter, ECF No. 23-10).[5] Thus, because Grand River did not amend its initial request to seek a total amount of $1,957,752 or file a subsequent request for an additional $995,332 in overpayments, Grand River did not properly present these additional overpayments to the Health Plan for review as required by Section 403(c)(2)(A)(ii).

As for Grand River's request for $342,480 in additional overpayments, Grand River acknowledges that the trustees of the Health Plan had not yet ruled on this request at the time Grand River filed its counterclaims. Although Grand River states it is prejudiced by the Health Plan's delay in deciding this claim, Grand River does not cite to any authority indicating that a plan administrator is required to respond to a request for overpayment within a certain time. As such, the Court sees no reason to excuse Grand River from Section 403(c)(2)(A)(ii)'s requirement that the plan must reject an employer's request for return of overpayments before the employer may file suit. See Brown's Excavating, 2015 WL

---

[5] The Court also notes that, regardless of whether Grand River established additional overpayments during arbitration proceedings, the Plans' Delinquency Policy provides that any request for overpayments must be "made in writing," "state the reason for the overpayment," "delineate the amount of excess contributions," and "contain copies of all documentation upon which the Contributing Employer relies to substantiate its request." (Delinquency Policy at 7–8, ECF No. 23-16).

2354624, at *13–14 (finding that employers failed to state a claim for overpayments where the complaint lacked allegations that the plan "refused to return the contributions arbitrarily, capriciously, without support of substantial evidence, or erroneously").

In sum, the Court finds that Grand River has failed to satisfy the requirements of Section 403(c)(2)(A)(ii) as to its claim for $1,337,992 in purported overpayments it made to the Health Plan. Accordingly, Grand River's counterclaim against the Health Plan will be dismissed to the extent it seeks an amount in excess of $962,420 in claimed overpayments.[6]

## IV.   CONCLUSION

For the foregoing reasons, the Plans' Motion to Dismiss or, Alternatively, for Summary Judgment on Grand River Amended Counterclaims (ECF No. 23), construed as a motion to dismiss, will be granted. A separate Order follows.

Entered this 30th day of March, 2021.

/s/

George L. Russell, III
United States District Judge

---

[6] The Plans also argue for dismissal of Grand River's requests for interest and attorneys' fees. The Court notes that Grand River's requests for these costs are not standalone causes of action, but rather part of its prayer for relief. As such, the Court declines to evaluate at this early stage of the litigation whether Grand River is entitled to a discretionary award of attorneys' fees or interest in addition to the damages it seeks against the Health Plan.